The next case in our call this morning is Agenda Number 11, Case Number 105795, Stephen Blum v. Judy Koster. Mr. Astrow may proceed when he is ready. Thank you, Mr. Chief Justice, Justices of the Supreme Court, Mr. Lovett, Mr. Adams. May it please the Court. I represent Stephen Blum, the petitioner before this Court. This case presents two matters of statutory construction and one issue of trial court discretion. I would like to combine the maintenance statutory construction issue and flow into the maintenance discretion issue because I think they are somewhat dependent upon each other. The maintenance statute, Section 504 of the Illinois Marriage and Dissolution of Marriage Act, and three times talks about the duration and amount that the trial court is given discretion to set when awarding maintenance. It says maintenance may be set for a temporary or permanent time, and clearly the word temporary is not the same as a temporary maintenance or dependent leet since that's covered under Section 501 of the Act. 504 says the court may award maintenance in amounts and for periods the court deems just, and 504 says that the court may award maintenance for fixed or indefinite periods of time. The maintenance modification statute, 510, states that subsection 504A, which I just quoted those words from, is expressly adopted in 510 when a modification petition is filed. There are no ambiguities in the language of either statute, and accordingly the appellate court's finding here that there is no statutory authority to limit a maintenance extension on review to a fixed period of time is simply wrong. With all due respect, I believe it is the appellate court, Second District's own act of legislation. This court in the Freeman case, which I've cited in our briefs, essentially states that the legislature did not limit the discretion of trial courts in the manner in which it wanted to fashion maintenance. As the court will recall, the Freeman trial court did a hybrid between maintenance and gross and periodic maintenance to make it deductible, and this court said that the almost unbridled discretion 504A provides allowed the judge to do that, the trial judge to do that. As to fixing the amount of maintenance for the duration that is set for, 504A also gives the trial court unlimited discretion in that regard, too, by using the phrase that the court can set maintenance in amounts the court deems just. I think it's instructive. Mr. Ostroff, just before you get too far advanced, you indicated that this may be an act of legislation by the Second District. Indeed, three districts now all agree, right? I disagree with that. I do not think that either Mayall or Carpell or Salinger, I don't think any of them stand for the proposition that the Second District stated here, which is the Second District stated here that the trial court has no authority to set maintenance for a specific period of time, make it end, and make it non-modifiable during that time. And Mayall was a case in which they simply said that if maintenance is set on a permanent basis, it's inherently reviewable. I don't think that's the same as saying a court doesn't have the authority to set a review period or an initial period of maintenance and not provide for a review. Did the Third District in Macaluso hold that 503J was limited to pre-decree proceedings and contrary to Concord, did not impose a timing requirement for post-decree proceedings? 503 is the attorney's fee issue. I'm at this point discussing the maintenance issue. So when Macaluso is not a maintenance case, it's a fee case. And when I get to the fee issue, I'll discuss it. So the Second District was on point with the other districts with respect to the attorney's fees, but you have a dispute as to whether or not in the matter of pre- and post-decree matters. All right. You may continue. Thank you. Thank you, Your Honor. I think it's instructive when talking about the discretion given to a trial court when setting maintenance to compare 504 with 505, which is the child support statute. In 505, the legislature said that child support has to be set in this particular percentage of somebody's income unless or except if a court makes specific findings that allow it to deviate from the guidelines. 504 contains no such language. If the legislature wanted to, they could have written a statute that said the court must always provide for a review, the maintenance awarded, if awarded, will always inherently be modifiable. And it didn't. And statutes are to be read as written as long as they're not ambiguous, and I do not see any ambiguity here. But doesn't the statute provide now that maintenance can be modified or terminated only upon a showing of substantial change of circumstances? That's 510. All right. But we do have that provision in this act. But what the effect of this order would be is that the trial court can bar modification, even if there is a change of circumstances. That's correct. And I do not see. Isn't that in conflict with that provision? I don't think it's in conflict with 510. And I think 504 and 510 both have to be looked at. And I'll give a quick example and then I'll direct 510 directly. Let's say that there's a three-year marriage and a court thinks that one of the spouses should get six months' worth of maintenance. Now, does that mean that the court, that if you award six months' worth of maintenance, that any time in that six months the recipient spouse can come in and ask for modification? At the end of the six months they can ask for a review? I think part of what I'm going to talk about here in terms of everything is that, you know, I may be naive, but I think that legislation is written for the people of the state of Illinois and not for the attorneys. And all of the, what Judge Waldick did here in the trial court was he kept these people from coming back to court. And I think 503, which Justice Thomas mentioned, I think that the legislature meant to keep people, wanted people's cases to end, whether they were pre-decree or post-decree. I, 510 is a permissive statute. It says the court may modify upon the showing of substantial change in circumstances. It doesn't say that it has to. Does it indicate that it can't be? It indicates that, the wording of 510 indicates to me that, and we wouldn't be dealing, in a situation where, say, maintenance was awarded with a review period. And a person comes in and asks for a review or asks for a modification and says there's been a substantial change in circumstances, I think the court has the authority, depending on what the substantial change in circumstances are, and they could, substantial change in circumstances could occur favoring each party in contested litigation. I don't think the court is forced to modify or extend maintenance simply because a substantial change in circumstances is found. 510 says the court may modify only if it finds a substantial change in circumstances. It doesn't say the court must modify if it finds a substantial change in circumstances. If we agree with you and say this is an appropriate order, does that mean if your fellow became disabled that he couldn't modify? That's correct. He could get an abatement. And he's stuck with it regardless. He's stuck with it as a judgment. And I think that that's anticipated. That if under this order, if something had happened to Dr. Blum, if he became disabled or, well, if he had passed away, it might have terminated. But if he became disabled, it's a judgment. I don't think he can come in and ask for an abatement, but I don't think that under this order he can get out of the obligation that he had for the three years. What significance, if any, Mr. Ostrow, does the fact that Steven and Judy agreed to reviewable maintenance in the marital settlement agreement have? I think the only significance it has is that the one time that the review was allowed for, five years and one month, nobody could have stopped it from occurring. It doesn't mean that Judy agreed never to have another one, but it also doesn't mean that her ability to seek a review was open-ended. And I think that I give an example in one of the briefs that I wrote that I think justifies the position that we're taking, which is that under the second district ruling here, somebody essentially in the position of Ms. Koster could come into court and a trial judge would think, well, you know, unlike Ms. Koster, this person did try to rehabilitate herself, did try to become self-supporting. She hasn't quite made it. I think another year of maintenance would be appropriate. But I think under this decision, a judge would be reluctant to do that because when the year's out, he's going to see these people again. And I think that the court can't be deprived of the authority to stop the litigation between the people if that's what the court deems appropriate. And it also, you know, it can, I mean, we are taking a chance on costing somebody maintenance they may need because of fear that the litigation's never going to end. And plus we do have to remember, as Justice Thomas just pointed out, that this was a negotiated agreement. And why would a payor ever negotiate a fixed period with a review for which they theoretically gave something up? I mean, here Dr. Womad agreed to pay for all of the children's college with after-tax dollars. If it becomes essentially meaningless, if that period of time, that five years and one month becomes essentially meaningless because your lawyer has to tell you, well, she'll come in for a review, and if the judge thinks she needs another year or two of maintenance, she's going to come back for a review again. If I'm the person being given that advice, I'm saying, well, why should I agree to this at all? And 502 states it's the policy of the Illinois Marriage and Dissolution of Marriage Act to promote agreements. And I think the appellate decision here militates against the agreements, agreements both inherently in the way I just said and in the way that it basically, I think, eviscerated Dr. Blum's agreement here. I want to briefly talk about Selinger, which is relied upon heavily by Ms. Koster. Selinger was an initial judgment after a trial. It was not a settlement, and there was a 26-year marriage. And the appellate court ruled that a short period of rehabilitation, real rehabilitative maintenance at $400 a month was inappropriate in a case like that. And I would agree, but Selinger does not stand for the principle that a court never has the authority to do what the court did here. And Mayall, which the Selinger court relied upon, Mayall simply says that if permanent maintenance is awarded, there is a review process inherent if the decree is silent as to that. And this leads me into the discretionary part of the maintenance ruling in this case. Judy Koster agreed, on top of having a statutory obligation in the first place to make efforts to become self-sufficient, she agreed in the agreement she had a responsibility to become self-supporting during the initial maintenance period. And she also agreed in the agreement that her standard of living after the dissolution would not be the $18,000 per month that was apparently the standard of living during the marriage that the appellate court here seized upon, but it turned out to be around $8,000 a month with the extra percentage maintenance payments that were made. And that was with two minors in her household. Now, the agreement said that the children's emancipation would not be a substantial change in circumstances, but it didn't say that they're no longer residing in a household wouldn't be one. Dr. Blum agreed to many things, too, such as the college education sole obligation for, and he agreed to divide the property so that Ms. Koster would have well in excess of a million dollars. And that's what agreements are, they're giving up one thing and getting another. And in my view, in our view, Ms. Koster gave up the right to expect to be dependent on Dr. Blum for the rest of her life or even for more than five years if she did not meaningfully strive toward self-sufficiently. And we also think she voluntarily agreed to give up the marital standard of living which the appellate court used. It was not the province of the appellate court to give those things back to her or to say that the trial court had to many years later. The trial court heard both experts on Ms. Koster's self-sufficiency efforts and they heard from Ms. Koster herself. Its conclusion as to the efficacy of those efforts and its impact on maintenance are not ones which no reasonable person would make. She forsook her career in law and her law degree to go into the jewelry business for which she had absolutely no experience. She kept no resume, she kept no applications, she did not use an employment counselor, and she made less than $20,000 in employment income in the five years after the marriage. And this is something that she agreed to, and the court had a right to look at it, and the court had a right to weigh the credibility of Ms. Koster and of the two expert witnesses. But under 510, the court has other aspects it can rely upon also such as the length of payments in terms of the length of the marriage. And here with the additional three years that Judge Waldeck awarded, Ms. Koster will have received eight years of maintenance after a 17-year marriage. The appellate, and also the court obviously can take into account the assets that the parties have, and the record showed that Judy had in excess of a million dollars in assets. Essentially the appellate court said here that the trial court put too much weight on what essentially was Ms. Koster's broken promise to support herself, and not enough on the standard of living that she had voluntarily given up five years before. Not only does the trial court have the discretion to look hard at the self-support issue because it's both statutory and it was in the agreement, it had no discretion to consider the marital lifestyle since that would have violated the agreement that the parties had made that what Ms. Koster's lifestyle would be immediately after the dissolution. And it had numerous other factors, as I pointed out, to vindicate its conclusion. I think the appellate court on the discretionary issue did what appellate courts are not supposed to do. It substituted its judgment for that of the trial court when the trial court acted within its discretion and when the trial court was the arbiter of credibility. Judge Waldeck, I think, actually did Ms. Koster the justice of giving her close to, you know, more than half of her prior maintenance payments for an additional three years, even though he found that her efforts of becoming self-sufficient had been woeful. On the issue of attorney's fees, I don't have an inherent philosophical horse to ride here. I do have a client to represent, and I think the side we have taken is the correct interpretation of 503. If the legislature had decided or even implied that contribution petitions in post-decree litigation would be treated differently than in pre-decree litigation, I would say so be it, but it did not. It stated a time period by which contribution petitions needed to be filed. It could have changed that for post-decree litigation in 503, in 508, or in 510. It did not do that, and I don't think that it's appropriate for a court to read into the statute that there is a different time limit for post-decree than pre-decree. And as far as Mancuso or Mancuso, I can't remember the pronunciation, but that Justice Thomas cited, the reason that they seized the pun and then I think this court in reversing its own conscious decision was, well, 503 makes reference to the factors for dividing property, and that only to take a look at when you're doing fees, and you're not dividing property in post-decree litigation, but post-decree litigation references property. In 510, it says that the property both people have should be examined when you're modifying maintenance or support, and there are 19 other factors that a court looks at in a modification petition, and there's really nothing that a court would look at to determine whether fees should be paid at the time an initial judgment is entered, or at the time post-decree fees are asked for. Each party's property is taken into consideration, each party's income, each party's health, each party's ability to acquire assets and income in the future. They're all looked at in both occasions, so I think it's a distinction without a difference. Counsel, time is up. Okay. If you'd like to take 30 seconds to finish, go ahead. All right, thank you. I think endless dissolution litigation should have some limits, and I think allowing a contribution petition to be filed after a motion of reconsideration has been heard on the substance of a post-decree petition makes these things go on forever, and I think that not allowing a judge to limit maintenance to a specific period of time without modification is both contrary to the statute itself and contrary to what should be all of our aim, which is to keep people out of court as much as possible. Thank you. Thank you, Counsel. Good morning, Your Honors. May it please the Court. Good morning, Mr. Ostrow. I'd like to start maybe with the CONCHAR issue first, if I may. I'm sorry, I'm Marvin Levin, and I represent Judy Koster in this litigation. If I may start with the contribution issue first, I think it's the easiest to dispose of. The Second District had this rule in CONCHAR that applied in a way that it made what was common and typical in pre-decree cases, contribution to attorney's fees, an issue for property distribution, a rule that also applied in post-decree matters. It didn't make sense, and the Second District has since reviewed it itself and changed its own rule, and it is now in line with the First District case of Carr, and it is in line with the Third District case of Macaluso. There is no longer any confusion between the districts as to how the contribution rule should be applied and the interpretation of 503J. It may be that in dicta in the First District, the Carr case was written by Justice Burke. There is in the dicta of a dissent, that case having been dismissed for one of jurisdiction, there is in the dicta of a dissent when in the dicta of the Second District case of CONCHAR, we disagree with its interpretation. In the dissent, there is an agreement with that interpretation. Now that the Second District has overruled itself and reversed its holding in CONCHAR, I don't think the districts are any longer in conflict, and they shouldn't be. The contribution action in a pre-decree case is obvious that it should be made prior to the disposition of property, like any bill. A gas bill, an electric bill, a mortgage, whatever the bill might be, legal fees should be part of the disposition of either property or debt. And it makes absolute sense in a pre-decree case. Judy Custer's case, as it presents itself, shows why it doesn't make sense in post-decree matters. And the appellate court, the Second District, recognizes it. It says, by its own decision, meaning you don't know what to ask for by way of contribution until you have the very decision. She didn't know if she was going to get the $8,600 a month or, as she did, the $3,500 a month in reduced maintenance. Should she have had to file that prophylactic motion for contribution after the close of proofs and prior to judgment without knowing what that judgment would allow her? And again, the Second District talks to the practical effect of having to do it in overruling its own decision and why it is obvious from statutory construction why the concha rule, as it earlier thought, should apply to post-decree cases, should not in post-judgment matters. And I think that area is quite cleared up. The statutory construction issues, if I may, also depend in part on the manifest weight factual issue. And I think it's important, just without repeating too many facts, to note that Judy was 33 years old at the time she married. She was 51 years old at the time of the divorce, 18-year marriage. She was 56 years old at the time that maintenance was to be reviewed pursuant to the agreement. Now, what's interesting is there is a distinction between the Golden case gives us a distinction between modifiability and reviewability. And that's sometimes lost a little bit. And I get a little confused, I have to admit. If you read the Justice Bowman dissent in Golden as to the distinction between modifiability and reviewability, he makes some very good points. But I think that there is a distinction between modifiability and reviewability. And as we heard my colleague a moment ago state, that we are dealing with issues of statutory construction. But I think in Judy Koster's case we deal with really just A5 of 510. That is, an order for maintenance may be modified or terminated only upon a showing of substantial change in circumstances. And all such proceedings, as well as in proceedings in which maintenance is being reviewed, meaning there's a distinction between modifiability and, excuse me, between proceedings where there is sought modifiability and reviewability. And essentially that's a burden shift difference. Under modifiability, you have to, Dr. Bloom would have to have shown a substantial change in circumstances. The Golden case, if your honors accept that, is showing the distinction between modifiability and reviewability. There is a distinction, and again, that distinction is a burden shift. Dr. Bloom would not have needed to show a substantial change in circumstances. The general factors of 504 and 510, as 510 references the 504 factors, all would have been reviewed for the purposes of determining whether or not Judy should continue on review to receive maintenance. Now, so the five years pass, and we're now in reviewability. And under reviewability, maybe Dr. Bloom does not have the burden of substantial change in circumstances, if you hold Golden to be accurate as to the distinction between reviewability and modifiability. But what factor is there to show that this new order of three years, 3,500, and non-modifiability, and ending at three years, should be then the result based on the review of those factors, given the facts, those simple facts that I've just described. And especially in light of, as Mr. Ostro has indicated, there is a manifest weight finding here, and that the trial court did really not apply the factors accurately. And that's really manifest when you look at what the experts themselves testified. Dr. Bloom called an expert to the stand who said that Judy Custer did what was reasonable in order to attempt to rehabilitate herself. And if you don't get permanent maintenance, well, all maintenance is reviewable. So here we are on review. There is a perceived need that is found of $8,000 a month. That's clear in the record. And now it's being reduced to $3,500 a month, which means that Judy, who has undertaken all reasonable efforts to rehabilitate herself, is now going to have to liquidate whatever asset she has if she's going to enjoy the lifestyle, despite a stipulation from Dr. Bloom, the stipulation in the record, that he can reasonably afford to continue to pay the maintenance of the $8,000 a month. And keep in mind, too, that when Judy, at 33, having two kids at 34 and 35, also took Dr. Stephen Bloom's child from a prior marriage and raised him. And she didn't just forego the use of her law degree. She, as one of the factors suggests, raised this family. And now at 56, it's told at 59, you're not going to get what you need to live, despite you made every reasonable effort. The court having said, and this is where the Second District departed from the trial court, the trial court having said that her inability to earn more income is self-imposed, his own expert said to the contrary. She had made reasonable efforts. She's now being punished for essentially failing. She had the law degree. She attempted to develop an immigration practice. What happened? Well, 2001, 9-1-1 happened, and it was very hard for her. And then she tried alternatively to develop a jewelry business. That also failed. So now she's traveled to California with Dr. Bloom. She's come back here. She's raised the family. She needs $8,000 a month. That's the standard of living. He can afford to pay it. She's made reasonable efforts. Now we say she can't have the benefit of that additional maintenance. Quite frankly, the appellate court got it right. The manifest weight finding is right. The statutory construction arguments are right. You'd have to be prescient into the future to say that on $3,500, if we force her to live for less, she'll do better. She's now 59 years of age. It's hard for a lawyer with a degree that you haven't used for 18 years to do better. Unless there are questions, that's pretty much my presentation. Thank you, counsel. Thank you. I'll just ask this. So I guess if your theory, your position is accepted, then a marriage of 17 years and a certain standard of living has been developed, doing those 17 years, can continue forever? It can continue to be reviewed. And, of course, in Selinger, what the Second District did in a certain case, although it's a pre-decree case, said, because the woman will never be able to earn enough so that the husband, and it was a husband in that case, it's gender neutral, but the husband in that case will always earn two to three times as much as her, we're going to make it permanent maintenance. But short of making it permanent maintenance, certainly the court shouldn't just cut it off without having some understanding of where she'll be at the time. And all this court did, the Second District court did, was say, in the exercise of your power, it should be reviewable, and given the manifest weight finding that the findings were against manifest weight, you shouldn't have reduced it in this particular case. And, of course, that's particular to this case based on evidence. I don't know if I answered your question, but I hope so. Thank you. Thank you, Your Honors. Dr. Bum's vocational expert, Grace Jen Fort, did not say that Ms. Koster had made reasonable efforts. In fact, she said that the jewelry, trying to go into the jewelry business was a mistake. She said that Ms. Koster was highly employable, that attorneys can work in many settings such as corporate, in addition to having private practices, which was the only thing that Ms. Koster tried to do was set up her own practice. And if we're going to talk about, you know, how old Ms. Koster is now, Dr. Bum is 62 years old. At some point he ought to have the expectation that he can retire, and even if he continues to work, that he's no longer responsible for someone who entered into an agreement saying, I will make appropriate efforts to become self-sufficient. And I think one thing that's being ignored here is that statutorily, at any rate, Judge Walda could have given her nothing. He could have said, I'm not extending your maintenance. I'm sorry. Now she could have then appealed and claimed that that was an abuse of discretion. But in terms of statutory construction, why are we forcing a court or why are we thinking that the legislature forced the court between making that judgment, I'm sorry, you're getting nothing from now on, or I'm going to extend it for a while, then we're going to see if we're going to extend it again. And where did the legislature preclude the middle ground of saying, you're going to get this much more maintenance and that will be the end of it? The court does have the authority to do that, and I don't know that Mr. Lovett addressed that before this court. Selinger does not stand for the proposition that a court cannot do that. It simply does not. Now in terms of CONSHAR, yes, the dicta in Carr and the third and second districts all say the same thing, but it's not as important that the districts be consistent as that they be correct. And with all due respect, they are all incorrect. Where in anywhere in the Illinois Marriage and Dissolution of Marriage Act, and as I stated, there were numerous opportunities to do so, does it state that the 30-day time limit does not apply to post-decree? And if it doesn't, what time limit does apply to seeking a contribution petition and post-decree litigation? And the matter that Mr. Lovett brought up about, well, Ms. CONSHA wouldn't know whether her maintenance is being extended or not, that's not the only factor that goes to contribution. She could lose the case and still say, well, I need contribution because I have no assets, because my income is limited, his is a lot more than mine is. And plus, in a pre-decree setting, you're required to file your contribution petition prior to knowing what your distribution is going to be and prior to the final ruling in the case. So I don't see the distinction there. I think we have to read statutes as they are written. This statute is written that contribution petitions have to be filed within 30 days of close of proofs or any time the court may extend within that period of time. And we can't artificially create a distinction for post-decree litigation. Thank you. Thank you, counsel. Case number 105795 will be taken under advisement.